IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

SHANE N. K.,[1]                          )
                                         )
                    Plaintiff,           )
                                         )
vs.                                      )   Case No. 18-cv-02038-DGW[2]
                                         )
COMMISSIONER of SOCIAL                   )
SECURITY,                                )
                                         )
                    Defendant.           )

## MEMORANDUM and ORDER

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying his application for Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Plaintiff filed an application for SSI in April 2015, alleging disability as of February 19, 2015. After holding an evidentiary hearing, the Administrative Law Judge (ALJ) denied the application on October 5, 2017. (Tr. 30-41). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 6). Administrative remedies have been exhausted and a timely complaint was

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) and Administrative Order No. 240. See, Docs. 10, 20.

filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ improperly determined at step three that plaintiff did not meet the "paragraph C" criteria of the mental health listings.

2. The ALJ erred by failing to account for moderate deficits of concentration, persistence, or pace in the residual functional capacity (RFC) finding.

3. The ALJ erred in her credibility determination of plaintiff.

## Applicable Legal Standards

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step 3, precludes a finding of disability.

*Ibid.* The plaintiff bears the burden of proof at steps 1–4. *Ibid.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Ibid.*

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, *Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of bipolar disorder (BD), anxiety disorder, and status post lumbar spine fusion with post-laminectomy syndrome.

The ALJ found that plaintiff had the RFC to perform work at the light exertional level, limited to no climbing of ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; and occasional balancing, stooping, crouching, and crawling. The ALJ found that plaintiff was also limited to performing simple routine tasks, but not at a fast pace, such as an assembly line. Additionally, plaintiff was limited to occasional interaction with co-workers and no interaction with the public. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff was unable to do his past relevant work, while also making an alternative finding that he was able to do other jobs at the light exertional level which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

### 1. Agency Forms

Plaintiff was born in 1969 and was 46 years old on the alleged onset date. (Tr. 105). He previously worked as a forklift driver, tower erector, and project manager. (Tr. 245). Plaintiff submitted a function report in June 2015 stating that he lived alone in an apartment. He claimed he had terrible anxiety with groups of people and struggled with depression. (Tr. 263). He said he only bathed once every six weeks because of his depression; shaved every five days; and had sticky notes around the house to remind him to take his medications. (Tr. 264-265). He reported cooking simple meals and grocery shopping once a month, but he relied heavily on other family to complete household chores. (Tr. 265-268).

In terms of problems with employment, plaintiff stated that he did not get along with authority figures because of his BD. He also said he reacted poorly to change and did not handle stress well. Plaintiff claimed that he was laid off twice for being argumentative, talking back to his supervisor, and walking out on the job. (Tr. 269).

Plaintiff's wife submitted a third-party function report in June 2015 in which she claimed plaintiff had terrible anxiety and struggled with depression. (Tr. 274). Plaintiff's wife further stated that he did not do chores and she cleaned his apartment twice a month. (Tr. 276). She also said that she accompanied plaintiff to grocery shop once a month. (Tr. 277). Plaintiff's sister additionally reported that plaintiff had problems getting along with family, friends, and neighbors because of anger and anxiety. (Tr. 279).

## 2.      Evidentiary Hearing

At the evidentiary hearing, plaintiff reported the he was separated from his wife. (Tr. 88).   When asked by the ALJ what prevented him from working, he stated he had "ultra-ultra-rapid mixed cycle bipolar I," explaining that he cycled through depression and mania quickly and sometimes had both together.   He said that the disorder caused him to be aggressive with people he had contact with.   He reported symptoms of pressured speech along with the inability to concentrate and follow through with tasks.   He also claimed he had short-term and long-term memory loss.   (Tr. 91-92).

Plaintiff stated that during his manic phases, he spent money irresponsibly, violated traffic laws, overate, became short tempered, and stayed up for days. Plaintiff reported having these manic episodes three days every week.   During depressive episodes, plaintiff said he ignored his personal hygiene, did not eat, and had bouts of suicidal ideation.   He stated that the two phases in combination caused him to potentially act upon the ideations.   (Tr. 92-93).   Plaintiff claimed that these mixed episodes also made him more prone towards aggression, and he related two stories involving aggression towards others in public.   (Tr. 94-95).   Plaintiff then complained that he also had anxiety, which caused him to be uncomfortable around groups of people.   (Tr. 97).

A VE also testified.   The ALJ asked the VE a hypothetical question which corresponded to the RFC assessment, specifically adding a limit to simple, routine tasks, but not at a fast pace such as an assembly line; occasional interaction with coworkers; and no interaction with the public.   The VE testified that there would be

jobs in the national economy using the hypothetical.   (Tr. 100).

### 3.    Medical Records

According to medical records, during his childhood, plaintiff experienced verbal abuse from his father, who was an alcoholic.[3]   He was diagnosed with BD at 13 years old and attempted suicide at 15 and 32 years old.   (Tr. 782).   He was also admitted to St. Mary's Hospital for psychiatric hospitalization from October 2012 to October 2013.   (Tr. 783).

In April 2014, plaintiff went for a follow up psychiatric evaluation with nurse practitioner Melissa Karaffa at the SSM Health Behavioral Health Center.   She noted that plaintiff's mood had been labile, and plaintiff commented that he felt like his medications were "slipping."   She noted that plaintiff was depressed, but also had racing thoughts and pressured speech.   She further stated that plaintiff was agitated and had suicidal thoughts.   Karaffa continued plaintiff's lithium and Klonopin, while also starting plaintiff on Seroquel and then Abilify.   (Tr. 782, 785, 789).

Plaintiff's mixed episodes appeared to continue during the proceeding months of 2014, with Karaffa describing him as hyper but sad and, sometimes, just depressed.   (Tr. 786, 800, 804, 824, 848).   Plaintiff complained about many stressors throughout this period.   He separated from his second wife and moved; his daughter was going through chemotherapy; and his uncle committed suicide.   (Tr.

---

[3] The record is less clear on whether plaintiff suffered from sexual abuse by family members, with early records stating that plaintiff did not experience this type of abuse and later records stating that he did.   (Tr. 782, 863, 869, 1316, 1657).

786, 799, 804).   Along with continuing his other medications, Karaffa started plaintiff on Zoloft.   (Tr. 828).

Plaintiff also attended therapy at St. Mary's Hospital.   On recommendation from Karaffa, he eventually enrolled in an intensive group therapy program at the hospital.   (Tr. 799, 407).   Plaintiff discussed his ex-wife moving back in with him; his difficulty in identifying his manic and depressive symptoms when they appeared; and cognitive distortions.   (Tr. 371, 373, 458, 466).   Some notes stated he was making progress, while others exhibited plaintiff's mixed episodes, socially isolative behavior, and excessive spending habits.   (Tr. 474, 497, 507, 532, 560, 577, 603, 616, 644, 668, 674).

In 2015, the cycling of plaintiff's symptoms continued to appear in both the individualized and group setting.   (Tr. 725, 730, 759, 774, 853, 863).   He had a mixed episodes, including one where he drove drunk and did not remember the incident.   (Tr. 725, 853).   He reported having manic episodes every three to five days where he did not sleep.   (Tr. 1485).   Plaintiff further complained about racing thoughts, anxiety, lack of motivation, depression, suicidal ideation, and having difficulty with hygiene.   (Tr. 1471, 1499, 1674).   This eventually caused his family to start paying his bills for him.   (Tr. 1470).   His group therapist noted that plaintiff appeared to make statements purely for shock value and did not appear to want to make personal changes.   (Tr. 764).   He discussed going inpatient to make his SSI case stronger during group therapy, which he eventually did later that year in August 2015.   (Tr. 764, 912).   In September 2015, he was arrested for peeping into tenants'

windows at his apartment building and was forced to move out. (Tr. 1510, 1674). Along with continuing his other medications, Karaffa started plaintiff on Lamictal with an eye toward decreasing his Abilify dosage. (Tr. 852, 854). She later stopped plaintiff's intake of Abilify and Zyprexa altogether and started plaintiff on Risperdal. (Tr. 868, 1510).

In 2016, plaintiff continued to appear imbalanced in Karaffa's notes. In March 2016, he complained of a continuing three-month mixed episode in which he displayed socially isolative behavior; got little sleep; and had racing thoughts, pressured speech, and frequent suicidal ideation. (Tr. 1458). Karaffa started plaintiff on Geodon to stabilize his mood and Depakote. (Tr. 1445, 1460). In April 2016, plaintiff was manic and described incidents where almost got into a fight while drunk and went on a spending spree. (Tr. 1445). Karaffa increased his Depakote dosage. (Tr. 1448). He continued to have manic symptoms up to August 2016, when he stopped taking Depakote. (Tr. 1400, 1414, 1426). He reported feeling balanced, but still depressed at that time. (Tr. 1400). In October and December 2016, plaintiff suffered from another mixed episode. He stated he was anxious, nervous, antisocial, and considered making suicide plans. (Tr. 1368,1385-1386). Karaffa increased his Geodon dosage. (Tr. 1388). Plaintiff later claimed that he attempted to commit suicide on Christmas day by taking 25 pramipexole pills. (Tr. 1356)

In 2017, plaintiff started out depressed before having another manic episode. (Tr. 1343, 1357). During the episode, he said he made a dangerous maneuver while

driving by passing 5 cars using the shoulder of the road. (Tr. 1328). Karaffa prescribed Wellbutrin, but then stopped that prescription before prescribing buspar. (Tr. 1331, 1345). Plaintiff also reported having depression and a lot of panic attacks. He stated that he was being haunted by two spirits that touched him and caused him to panic. (Tr. 1315-1316). Later that year, he alleged that Karaffa dropped him as a patient. (Tr. 1544, 1658). Plaintiff saw Dr. Erum Qazi at St. Louis University Hospital, where he disclosed another manic episode that included delusions of grandeur, disturbed sleep, and hopelessness. (Tr. 1638, 1658). He additionally admitted to using marijuana. (Tr. 1544, 1658).

### 4. State Agency RFC Assessments

In May 2015, acting as a state agency consultant, Margaret Sullivan Ph.D., assessed plaintiff's mental RFC based on a review of the file materials. Dr. Sullivan found that plaintiff had the ability to perform at least simple repetitive tasks, but said that he did have concentration and persistence limitations. (Tr. 113-114).

In August 2015, acting as a state agency consultant, Erika Gilyot-Montgomery, Psy.D., assessed plaintiff's mental RFC based on a review of the file materials. On the psychiatric review technique, she identified listings 12.04, affective disorders, 12.08, personality disorders, and 12.09, substance addiction disorders, concluding that as to the "paragraph B" criteria of the listings, plaintiff had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning and in maintaining concentration, persistence, or pace; and one or two repeated episodes of decompensation of extended duration. (Tr. 124). Dr. Gilyot-Montgomery found

that the evidence did not establish the presence of the "paragraph C" criteria of the listings. She stated that plaintiff reported improvement in his symptoms during recent psychiatric visits and had a fair response to treatment and group therapy. She found that plaintiff's statements of functional limitations were partially credible because "the objective medical evidence in file does not support the severity of alleged limitations." She concluded that plaintiff was capable of simple, detailed tasks with superficial contact with others, infrequent changes in routine, and moderate work-related responsibilities. (Tr. 128-29).

## Analysis

Plaintiff argues that the ALJ erred by concluding at step three that he did not meet the "paragraph C" criteria of the 12.00 mental health listings. More particularly, he asserts that he met the "marginal adjustment" section of the "paragraph C" criteria. Plaintiff's arguments ultimately have some merit, necessitating a remand of the ALJ's step-three finding for further analysis.

"The Listing describes impairments that are considered presumptively disabling when a plaintiff's impairments meet the specific criteria described in the Listing." *Maggard v. Apfel*, 167 F.3d 376, 379 (7th Cir. 1999) (citing 20 C.F.R. §§ 404.1525(a), 416.925(a)). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); see also *Ribaudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003); *Scott v.*

*Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002). The claimant bears the burden of proving that his impairments meet or equal each element of a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard*, 167 F.3d at 380.

The "paragraph C" criteria of the applicable mental health listings require:

> Your mental disorder [depressive, bipolar, and related disorders; anxiety and obsessive-compulsive disorders] is "serious and persistent;" that is you have a medically documented history of the existence of the disorder over a period of at least 2 years, and there is evidence of both:
>
> 1. Medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s) that is ongoing and that diminishes the symptoms and signs of your mental disorder . . . *and*
>
> 2. Marginal adjustment, that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life . . . .

20 C.F.R. § 404 Subpt. P, App'x 1, §§ 12.04 12.06 (2018).

At the time the ALJ issued her decision, plaintiff had a mental health disorder, BD, of at least two years duration that had caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychological support. The record also shows that plaintiff participated in mental health services at SSM Health Behavioral Health Center from January 2014 to April 2017 and group counseling at St. Mary's Hospital from July 2014 to April 2015. He received medication, counseling, and life skills training through these visits. The question really centers on whether plaintiff also met the last of the two required criteria of "paragraph C"— the marginal adjustment criterion.

The Social Security regulations articulate that the marginal adjustment criterion is satisfied "when the evidence shows that, despite [the plaintiff's] diminished

symptoms and signs, [a plaintiff] ha[s] achieved only marginal adjustment." 20 C.F.R. § 404 Subpt. P, App'x 1, § 1200D(g)(2)(c) (2018). This criterion is further defined in the regulations:

> "Marginal adjustment" means that your adaption to the requirements of daily life is fragile; that is, you have minimal capacity to adapt to changes in your environment or to demands that are not already part of your daily life. We will consider that you have achieved only marginal adjustment when the evidence shows that changes or increased demands have led to exacerbation of your symptoms and signs and to deterioration in your functioning; for example, you have become unable to function outside of your home or a more restrictive setting, without substantial psychosocial supports (see 12.00D). Such deterioration may have necessitated a significant change in medication or other treatment. Similarly, because of the nature of your mental disorder, evidence may document episodes of deterioration that have required you to be hospitalized or absent from work, making it difficult for you to sustain work activity over time.

20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00(G)(2)(c) (2018). Psychosocial supports as used in 12.00D means "[y]ou receive help from family members or other people who monitor your daily activities and help you to function." 20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00D (2018). "For example, family members administer your medications, remind you to eat, shop for you and pay your bills, or change their work hours so you are never home alone." 20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00D (2018).

Here, when considering the "paragraph C" criteria, the ALJ stated:

> In this case, the evidence fails to establish the presence of the "paragraph C" criteria. The medical record does not document a history of a depressive, bipolar, or related disorder, or anxiety and obsessive-compulsive disorders of at least two years' duration with evidence of ongoing medical treatment, mental health therapy, psychosocial support(s), or a highly structured setting(s), and marginal adjustment with minimal capacity to adapt to changes in one's environment or to

> demands that are not already part of one's daily life (Listings 12.04 and 12.06).

(Tr. 34).

This discussion of the "paragraph C" criteria by the ALJ offers no analysis of the marginal adjustment criterion. *Barnett*, 381 F.3d at 668. However, the lack of analysis here, and specifically the marginal adjustment criterion, could be a harmless error. A harmless error is one that the Court is confident would not impact the ultimate decision of disability and requires the Court to determine if the lack of discussion involving marginal adjustment affected that outcome.

The Commissioner argues that the ALJ's step-three finding is bolstered by the opinion of Dr. Gilyot-Montgomery, the state agency psychologist, because she specifically concluded in her opinion that evidence does not establish the presence of the "C" criteria. It is true as a general matter that "[t]he ALJ may properly rely upon the opinion of these medical experts" when determining whether a plaintiff meets or equals a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004) (citing *Scott v. Sullivan*, 898 F.2d 519, 524 (7th Cir. 1990)); see also SSR 96-6p, 1996 WL 374180, at *3 (July 2, 1996). But in this instance, the ALJ's reliance on the opinion of Dr. Gilyot-Montgomery is problematic. She issued her opinion in August 2015—*before* Rice had received at least two years of mental health treatment as required by "paragraph C." See 20 C.F.R. § 404 Subpt. P, App'x 1, § 12.00. However, at the time the ALJ issued her decision in October 2017, plaintiff *had* been participating in mental health treatment for more than two years, and thus by that time, he met this

portion of the listing. As such, the ALJ's reliance on the opinion of Dr. Gilyot-Montgomery cannot rehabilitate the ALJ's perfunctory discussion of the marginal adjustment criterion of "paragraph C" in this instance.

Furthermore, the treatment notes here are replete with concerns about plaintiff's reliance on his support system and the lack of ability to handle the additional stress of returning to employment. In her third-party function report, plaintiff's wife stated that he does not do chores and she cleaned his apartment twice a month. She also said that she accompanied plaintiff to grocery shop once a month. His family took over paying his bills for him due to his rapid and continuous manic and depressive cycling. Family also left sticky notes around the house to remind him to take his medications. Simply stated, the evidence of record pertinent to the marginal adjustment criterion of "paragraph C" merits a discussion by the ALJ.

Irrespective of the "paragraph C" issue, plaintiff succeeds for a much simpler reason. Plaintiff argues that the ALJ improperly weighed his credibility related to his limitations, and as a subset of that argument, alleged that the ALJ cherry picked portions of physician's reports to support a finding of non-disability. In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). While the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his findings. *Ibid.* (citing *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001) and *Zurawski*, 245 F.3d at 888). Otherwise, it is impossible for a

reviewing court to make an informed review.   *Golembiewski*, 322 F.3d at 917 (citing *Smith v. Apfel*, 231 F.3d 433, 438 (7th Cir. 2000)).

In the medical records, there are a bevy of psychiatric and group therapy notes from 2014 that tend to lend credibility to plaintiff and his alleged symptoms.   These notes included details of the cycling of plaintiff's mood and behavior; Karaffa's medication changes; and family stressors.   The ALJ opted to mention none of these notes from 2014 in her decision, and she erred in neglecting to do so.

Additionally, the Court will point out that while the ALJ concluded that the objective medical evidence indicated that plaintiff's impairments could reasonably be expected to cause his alleged symptoms, she also concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."   The Seventh Circuit has called this language "even worse" than "meaningless boilerplate."   See *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi*, 315 F.3d at 787–88.   On remand, the ALJ should be more vigilant in addressing this issue as well.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that he should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## <u>Conclusion</u>

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   July 15, 2019.**

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**